IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 24-cv-03590-PAB-SBP

DARIUS NAVRAN, Ph.D.,

Plaintiff,

v.

ARAPAHOE COMMUNITY COLLEGE,

Defendant.

---

**DEFENDANT'S MOTION TO DISMISS
PLAINTIFF'S COMPLAINT AND JURY DEMAND (DOC. 1)**

---

Defendant Arapahoe Community College ("Defendant" or "ACC"), through its attorneys,

DIETZE AND DAVIS, P.C., submits the following Motion to Dismiss Plaintiff's Complaint and Jury

Demand (**Doc. 1**).  In support thereof, Defendant states as follows:

**Certificate of Conferral:**

Pursuant to D.C.Colo.LCivR 7.1(a), undersigned counsel conferred with Plaintiff's counsel

regarding the arguments and relief sought in this Motion.  Plaintiff opposes the Motion.

**I.    INTRODUCTION**

Plaintiff Darius Navran, Ph.D. ("Plaintiff" or "Dr. Navran"), a 70-year-old Middle Eastern

male who has resided in the United States for 48 years, brings this action asserting five claims: (1)

race, ethnicity, and national origin discrimination under Title VII of the Civil Rights Act of 1964,

42 U.S.C. § 2000(e) ("Title VII"), *et seq.*; (2) age discrimination in violation of the ADEA, 29

U.S.C. § 621, *et seq.*; (3) retaliation under Title VII, 42 U.S.C. § 2000(e), *et seq.*; (4) discrimination

1

under Colorado's Anti-Discrimiation Act, Colo. Rev. Stat. § 24-34-402 ("CADA"), *et seq.*; and (5) retaliation under CADA, § 24-34-301, *et seq. See* Plaintiff's Complaint and Jury Demand (herein referred to as "Complaint" or **Doc. 1**) at ¶¶ 9, 12-18, and 19-24 (re general allegations); ¶¶ 27-35 (First Claim); ¶¶ 37-42 (Second Claim); ¶¶ 44-48 (Third Claim); ¶¶ 56-59 (Fourth Claim); ¶¶ 61-64 (Fifth Claim).

Plaintiff alleges he "has been adversely affected" by Defendant Arapahoe Community College (or "ACC"), a "public community college," by way of its "discriminatory practices, retaliation, and creation of a hostile work environment based on his race, ethnicity, national origin, and age." *Id.* at 1, ¶ 2.  Plaintiff was hired by ACC in September 2018 as the Instructor Dean for Health and Public Services, and "consistently received commendable and exemplary performance ratings from his previous supervisors," and "had never been reprimanded nor written up for any performance []or conduct  issues." *Id.* at ¶¶ 10-11.

Plaintiff claims "in mid-2022, [he] began experiencing discriminatory treatment based on his race, ethnicity, national origin, and age under the supervision of Dr. Cheryl Calhoun, the newly appointed Provost and Vice President." *Id.* at ¶ 12.  Plaintiff alleges, "[p]resumably due to his status as a Middle Eastern male with an accent, Dr. Calhoun regularly mocked Dr. Navran's English language comprehension during meetings and communications, despite Dr. Navran's decades of experience in higher education administration in the [U.S.]." *Id.* at ¶ 13.  He alleges he also "observed and experienced a pattern of discriminatory treatment where minority employees, including a Hispanic American male, and an Ethiopian male, were regularly targeted for adverse treatment." *Id.* at ¶ 14.  He claims "[s]imilarly-situated and younger white employees received

2

more favorable treatment, including but not limited to meeting scheduling, communication, and performance evaluations." *Id.* at ¶ 15.

On May 25, 2022, "without notice or explanation" and "without any justification," Dr. Navran's performance evaluation was changed by Dr. Calhoun from "Exemplary" to "Commendable." *Id.* at ¶ 16. The following month, Dr. Calhoun "regularly cancel[ed] meetings with Dr. Navran, including to discuss critical issues such as performance goals for 2022-23, den[ied] time-off requests without justification, and subject[ed] him to public humiliation during staff meetings." *Id.* at ¶ 17. In August 2022, "Dr. Calhoun was critical of Dr. Navran's request for time off to celebrate his wedding anniversary, despite similar requests being routinely granted to other employees." *Id*. at ¶ 18. "[F]earful of retaliation, Dr. Navran worked remotely during [the] vacation [and] despite having also contracted Covid-19." *Id*. "Despite advising Dr. Calhoun of this, [she] required Dr. Navran to input the time… as 'vacation' time." *Id.* at ¶ 18.

Plaintiff claims that "[a]fter [he] raised concerns about [the] discriminatory treatment to Human Resources ["HR"]," Defendant "escalated its retaliatory actions." *Id.* at ¶ 19. In September 2022, he was placed on a Performance Improvement Plan ("PIP") which "contained false, misleading, and inaccurate information," to which Dr. Navran responded, highlighting his achievements and including positive feedback shown by an anonymous survey. *Id.* at ¶¶ 20-21. He worked diligently to comply with the PIP's requirements and attempted to meet with Dr. Calhoun and an HR representative regularly but "Dr. Calhoun often failed to meet with Dr. Navran," and "[a]t no time was he provided any feedback… let alone [notified] that he was in danger of failing the PIP." *Id.* at ¶ 22. Plaintiff alleges that, during a November 2022 meeting, Dr. Calhoun pressured Dr. Navran to disclose the identities of anonymous survey participants, despite

3

instructions from the State Representative not to do so. *Id.* at ¶ 23.  He states when he refused, Dr.

Calhoun attempted to confirm the identities by naming individuals and, after another refusal, stated

that the survey would affect Dr. Navran's "exit from the PIP." *Id.*  In January 2023, "during what

was represented as a routine PIP check-in meeting, Defendant abruptly terminated Dr. Navran's

employment." *Id.* at 24.

On December 29, 2024, Plaintiff commenced this lawsuit, claiming that Defendants (1)

discriminated against him by "subjecting him to disparate treatment and a hostile work

environment," by "mocking his English language comprehension," treating him less favorably

than similarly-situated white employees, subjecting him to "heightened scrutiny and criticism,"

"belittling and criticizing Plaintiff unjustifiably, "unjustifiably" altering his PIP, "falsely accusing

Plaintiff of misconduct and poor performance," imposing an "unwarranted" PIP, and ultimately

terminating his employment, *see id.* at ¶¶ 31, 39, 45, 57, 62; and (2) retaliated against him by

implementing an "unjust" PIP, "[i]ncreasing scrutiny of his work[,] [c]reating a hostile work

environment[,] [d]enying routine requests for time off[,] [c]anceling meetings without

justification[,] and [u]ltimately terminating his employment." *Id.* at ¶¶ 45, 62.

Defendant ACC moves to dismiss: (A) Plaintiff's Second, Fourth, and Fifth Claims for

Relief under C.R.C.P. 12(b)(1) on the grounds that (1) ACC is an arm of the state and (2) neither

ADEA nor CADA abrogate its Eleventh Amendment sovereign immunity; and (B) Plaintiff's First

and Third Claims for Relief, for discrimination and retaliation under Title VII, under C.R.C.P.

12(b)(6) on the grounds that Plaintiff's allegations are threadbare, conclusory, and vague, and

therefore insufficient to state a plausible claim for relief.  As set forth more fully below, each of

Plaintiff's claims fails as a matter of law and should be dismissed in its entirety.

## II.    <u>LEGAL STANDARD</u>

### A.    Federal Rule of Civil Procedure Rule 12(b)(1)

As courts of limited jurisdiction, federal courts must have a specific legal basis for their jurisdiction. *See Morris v. City of Hobart*, 39 F.3d 1105, 1111 (10th Cir. 1994) (citing *Castaneda v. INS*, 23 F.3d 1576, 1580 (10th Cir. 1994)).  The determination of a court's subject matter jurisdiction is a question of law. *Madsen v. U.S. ex rel. U.S. Army, Corps of Eng'rs*, 841 F.2d 1011, 1012 (10th Cir. 1987).  "A court lacking jurisdiction cannot render judgment but must dismiss the cause at any stage of the proceedings in which it becomes apparent that jurisdiction is lacking." *Basso v. Utah Power & Light Co.*, 495 F.2d 906, 909 (10th Cir. 1974). "The burden of establishing subject-matter jurisdiction is on the party asserting jurisdiction." *Montoya v. Chao*, 296 F.3d 952, 955 (10th Cir. 2002) (citing *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377, 114 S. Ct. 1673, 128 L. Ed. 2d 391 (1994)).

### B.    Eleventh Amendment Sovereign Immunity

The Eleventh Amendment to the United States Constitution bars suits in federal court against a state or its instrumentalities unless the state has unequivocally consented to suit or Congress has validly abrogated its immunity. *See* U.S. Const. amend. XI; *Peterson v. Martinez*, 707 F.3d 1197, 1205 (10th Cir. 2013); *Tennessee v. Lane*, 541 U.S. 509, 517, 158 L. Ed. 2d 820 (2004); *see also Colby v. Herrick*, 849 F.3d 1273, 1276 (10th Cir. 2017); *Ross v. Bd. of Regents of The Univ. of N.M.*, 599 F.3d 1114, 1117 (10th Cir. 2010); *V-1 Oil Co. v. Utah Dept. of Pub. Safety*, 131 F.3d 1415, 1421 (10th Cir. 2002).  This immunity applies to the state regardless of the relief sought. *Smith v. Plati*, 56 F. Supp. 2d 1195, 1200 (D. Colo. 1999) (citing *Cory v. White*, 457 U.S. 85, 91, 72 L. Ed. 2d 694 (1982)), *aff'd*, 258 F.3d 1167 (10th Cir. 2001).

Entities that qualify as "arms of the state" are likewise entitled to Eleventh Amendment immunity. *Watson v. University of Utah Med. Ctr.*, 75 F.3d 569, 574 (10th Cir. 1996) (citing *Mascheroni v. Board of Regents of the Univ. of Cal.*, 28 F.3d 1554, 1559 (10th Cir. 1994)).

Under the arm-of-the-state doctrine, whether an entity is immune to liability pursuant to Eleventh Amendment immunity "depends, at least in part, on the nature of the entity created by state law." *Mt. Healthy Cty. Sch. Dist. Bd of Edu. v. Doyle*, 429 U.S. 274, 280, 50 L. Ed. 2d 471 (1977); *Sturdevant v. Paulsen*, 218 F.3d 1160, 1164 (10th Cir. 2000); *see also Regents of the Univ. of Cal. v. Doe*, 519 U.S. 425, 429-30 & n.5, 137 L. Ed. 2d 55 (1997); *See Duke v. Grady Mun. Schs.*, 127 F.3d 972, 994 (10th Cir. 1997) (the arm-of-the-state status must be determined in each case by reference to the particular state laws characterizing the entity); *Ambus v. Granite Bd. of Educ.*, 995 F.2d 992, 994 (10th Cir. 1993) (en banc).

Courts evaluate four factors relevant to the arm-of-the-state determination:

> *(1) the characterization of the governmental unit under state law; (2) the guidance and control exercised by the state over the governmental unit; (3) the degree of state funding received; and (4) the governmental unit's ability to issue bonds and levy taxes on its own behalf.*

*Sturdevant*, 218 F.3d at 1166 (citing *Sutton v. Utah State Sch. for the Deaf & Blind*, 173 F.3d 1226, 1232 (10th Cir. 1999).

### C.    Federal Rule of Civil Procedure Rule 12(b)(6)

Under Rule 12(b)(6), a court may dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6).  In deciding a motion under Rule 12(b)(6), the court must "accept as true all well-pleaded factual allegations… and view these allegations in the light most favorable to the plaintiff." *Casanova v. Ulibarri*, 595 F.3d 1120, 1124 (10th Cir. 2010) (quoting *Smith v. United States*, 561 F.3d 1090, 1098 (10th Cir. 2009)).  A plaintiff may not

rely on mere labels or conclusions, "and a formulaic recitation of the elements of a cause of action will not do." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555, 167 L. Ed. 2d 929 (2007). Rather, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 173 L. Ed. 2d 868 (2009); *see also Robbins v. Oklahoma*, 519 F.3d 1242, 1247 (10th Cir. 2008) (explaining that plausibility refers "to the scope of the allegations in a complaint," and that the allegations must be sufficient to nudge a plaintiff's claim(s) "across the line from conceivable to plausible."). The court must ultimately "determine whether the complaint sufficiently alleges facts supporting all the elements necessary to establish an entitlement to relief under the legal theory proposed." *Forest Guardians v. Forsgren*, 478 F.3d 1149, 1160 (10th Cir. 2007).

## III.     <u>ARGUMENT</u>

### A. Plaintiff's Second, Fourth, and Fifth Claims are barred by the Eleventh Amendment.

"Because an assertion of Eleventh Amendment immunity concerns the subject matter jurisdiction of the district court, [courts] address th[is] issue before turning to the merits of the case." *Ruiz v. McDonnell*, 299 F.3d 1173, 1180 (10th Cir. 2002).

#### 1.   Arapahoe Community College is an arm of the state.

In this Circuit, it is well-settled that the state universities <u>and</u> **colleges** are state entities capable of claiming Eleventh Amendment immunity. *E.g., University of Texas v. Vratil*, 96 F.3d 1337, 1340 (10th Cir. 1996) (citing *Seminole Tribe of Fla. v. Fla.*, 134 L. Ed. 2d 252, 116 S. Ct. 1114, 1124 (1996) ("state colleges and universities... are entitled to Eleventh Amendment immunity"); *Churchill v. Univ. of Colo. at Boulder*, 285 P.3d 986, 998, 2012 CO 54 (Colo. 2012); *Garcia v. Metro. State Univ. of Denver*, Civil Action No. 19-cv-02261-RBJ, 2020 U.S. Dist. LEXIS

7

30847, *17 (D. Colo. Feb. 24, 2020); *Johnson v. Baca*, Civil Action No. 13-cv-2747-WJM-KMT, 2015 U.S. Dist. LEXIS 6030, *3 (D. Colo. Jan. 20, 2015) (Western State University).

Nevertheless, applying the arm-of-the-state doctrine's several factors confirms that Arapahoe Community College is an arm of the State of Colorado entitled to Eleventh Amendment immunity:

a.    ***Characterization under state law***.   Colorado statutes expressly establish a "state system of community and technical colleges" and place it "under the management and jurisdiction of the state board for community colleges and occupational education." C.R.S. § 23-60-201.  Arapahoe Community College is included by name in this state system. C.R.S. § 23-60-205.  And as discussed previously, the Colorado Supreme Court and other federal courts in this district have uniformly treated state educational institutions as arms of the state. *See Churchill*, 285 P.3d at 998; *Vratil,* 96 F.3d at 1340.

b.    ***Guidance and control by the state***.   The State Board for Community Colleges and Occupational Education possesses all the "authority, responsibility, rights, privileges, powers, and duties customarily exercised by the governing boards of institutions of higher education" with respect to Colorado's community and technical colleges. C.R.S. § 23-60-202.  This includes both administrative and financial oversight, as well as academic governance.  Specifically, the Board determines institutional leadership by appointing the chief administrative officer of each college, § 23-60-202(1)(d); controls academic matters, including recommending, reviewing, and/or approving curricula, degree programs, certificate requirements, and awards, §§ (e), (f), (f.5); sets tuition and fees consistent with legislative appropriations, § (c); controls capital development and facilities, including constructing, leasing, or otherwise providing physical facilities and issuing

revenue bonds for college purposes, § (b); prepares and transmits budget requests and allocates operating and capital funds to the colleges, §§ (h), (k); establishes policy governing the colleges, including oversight of federal instructional and vocational funds, §§ (i), (j); coordinates academic transfer programs with four-year state institutions, §§ (g), (m).  Collectively, these provisions confirm that the Board exercises pervasive control and influence over all material aspects of Arapahoe's governance, finances, curriculum, and administration. This level of centralized oversight weighs heavily in favor of arm-of-the-state status.

c.    ***Degree of state funding***.  Arapahoe Community College is funded "in the same manner as are all other state institutions of higher education." C.R.S. § 23-60-204.  Thus, its operations are financially tied to the State.

d.    ***Ability to issue bonds or levy taxes***.  Nothing in the statutory scheme suggests that Arapahoe Community College has independent authority to raise revenue by levying taxes or issuing general obligation bonds.  This lack of independent fiscal autonomy further supports its status as an arm of the state. *See Utah State Sch. for the Deaf & Blind*, 173 F.3d at 1232.

e.    ***Legal liability for judgments***. Although Colorado law does not explicitly address whether judgments against ACC are paid from the state treasury, courts emphasize the legal, rather than practical, obligation for payment. *Sturdevant*, 218 F.3d at 1164. Given ACC's integration into the state's higher education system and state financing provisions, any judgment against ACC would in practical and legal effect fall to the State of Colorado.

Taken together, these factors confirm that ACC is an instrumentality of the state and is entitled to sovereign immunity under the Eleventh Amendment.

9

### 2.    The ADEA and CADA do not abrogate state sovereign immunity.

The Supreme Court has expressly held that the ADEA does not operate to validly abrogate state sovereign immunity. *See Kimel v. Fla. Bd. of Regents*, 528 U.S. 62, 91, 145 L. Ed. 2d 522 (2000); *see also Migneault v. Peck*, 204 F.3d 1003, 1004 (10th Cir. 2000).  It is thus "well settled that the Eleventh Amendment bars suits against the states under… the ADEA." *Sparks v. Univ. of Colo.*, Civil Action No. 21-cv-02016-RM-NYW, 2022 U.S. Dist. LEXIS 67621, at *9 (D. Colo. Apr. 12, 2022) (citing *Zimmerman v. Univ. of Utah*, No. 2:13-cv-01131-JNP-DBP, 2016 U.S. Dist. LEXIS 161817, 2016 WL 6839371, at *3 (D. Utah Nov. 21, 2016)).

With respect to Plaintiff's claims under CADA, the Colorado Governmental Immunity Act (CGIA), C.R.S. § 24-10-104 *et seq.*, makes clear that Colorado has <u>not</u> waived its Eleventh Amendment immunity for CADA claims. *See Harp v. Dept. of Human Servs.*, No. 11-cv-01972-PAB-CBS, 2012 U.S. Dist. Lexis 71559, at *5 (D. Colo. Mar. 9, 2012) (CADA claim against the state in federal court precluded by Eleventh Amendment); *see also Mascheroni v. Bd. of Regents of the Univ. of Cal.*, 28 F.3d 1554, 1556 (10th Cir. 1994) ("Eleventh Amendment shields the Board of Regents from suit in federal court for alleged state law violations."); *Griess v. Colorado*, 841 F.2d 1042, 1044-45 (10th Cir. 1988) (the CGIA did not "waive[]… the state's constitutional immunity to suit in federal court"); *see also Slover*, 1:21-cv-01378-SKC, 2022 U.S. Dist. LEXIS 48885, *8.

Because Arapahoe Community College is an arm of the state and Colorado has not waived its Eleventh Amendment immunity under the ADEA and CADA, Plaintiff's Second, Fourth, and Fifth Claims pursuant to the ADEA and CADA are barred by the Eleventh Amendment and should be dismissed.

**B.  Plaintiff fails to plausibly allege discrimination or retaliation under Title VII**

Plaintiff's allegations fail to meet the plausibility standard under *Iqbal* and *Twombly*. Although he recites the elements of hostile work environment, disparate treatment, and retaliation, his claims are based on vague, conclusory assertions that lack any factual detail.

**1.  Plaintiff fails to state a claim for Title VII discrimination.**

Title VII allows a plaintiff "[to] prove discrimination in several different ways, including proof of a hostile work environment or disparate treatment." *Throupe v. Univ. of Denver*, 988 F.3d 1243, 1251 (10th Cir. 2021).  To establish a prima facie disparate-treatment claim under Title VII, a plaintiff must demonstrate that "(1) [he] belongs to a class protected by Title VII, (2) [he] suffered an adverse employment action, and (3) the challenged action took place under circumstances giving rise to an inference of discrimination." *Id.* at 1252.

Although Plaintiff may arguably satisfy the first two prongs by alleging he is a 70-year-old Middle Eastern male and that he was terminated, his allegations fail to satisfy the third prong. Plaintiff alleges "similarly-situated and younger white employees received more favorable treatment," but he fails to name a single comparator, describe their roles, or specify the treatment they allegedly received. *See Khalik v. United Air Lines,* 671 F.3d 1188, 1194 (10th Cir. 2012) (affirming dismissal where plaintiff provides only conclusory allegations that she was treated differently).  He also claims that other minority employees were "targeted for adverse treatment," but, again, provides no names, details, or concrete examples of who or how.  Allegations of this nature, without more, are insufficient to support an inference of discriminatory animus.

Many of the alleged actions—such as cancellation of meetings, criticism in staff meetings, and denial of a vacation request—do not, without further factual context, suggest discriminatory

motivation or rise to the level of adverse actions. *See Throupe,* 988 F.3d at 1255 ("Not all offensive or hurtful conduct within the workplace is actionable under Title VII").

Alternatively, to establish a prima facie hostile-work-environment discrimination claim under Title VII, a plaintiff must demonstrate that "(1) he was discriminated against because of his [membership in a protected group], and (2) that the discrimination was sufficiently severe or pervasive such that it altered the terms or conditions of his employment." *Id*. at 1251. General workplace hostility or interpersonal conflict, if not linked to discriminatory animus, is not actionable. *Bolden v. PRC Inc*., 43 F.3d 545, 551 (10th Cir. 1994).

Plaintiff's allegations do not meet this standard. First, his assertion that Dr. Calhoun "mocked his English language comprehension" lacks any factual specificity—no quotes, dates, frequency, or context are provided. Courts regularly dismiss such threadbare assertions. *Petersen v. Utah Dep't of Corr.*, 301 F.3d 1182, 1188 (10th Cir. 2002) and *Held v. Ferrellgas, Inc*., 505 F. App'x 687, 691 (10th Cir. 2012) (where general allegations of "rude" or "unconscionable" treatment were held to be insufficient).

Second, his claims of "public humiliation" and increased scrutiny are conclusory and devoid of examples that might show hostility ***based on*** race, national origin, or age, as opposed to personality conflict or ordinary workplace oversight. *See Bolden*, 43 F.3d 545, 551 (10th Cir. 1994) ("general harassment if not racial or sexual is not actionable"). Plaintiff must show "more than a few isolated incidents of racial enmity." *Id.* at 551 (citing *Hicks v. Gates Rubber Co*., 833 F.2d 1406, 1412 (10th Cir. 1987) (internal quotations omitted). "Instead of sporadic racial slurs, there must be a steady barrage of opprobrious racial comments." *Id*. (citing *Hicks* at 1412-13.

Even viewed collectively, the alleged conduct—denial of time off, criticism in meetings, changes to a performance evaluation—does not rise to the level of severity or pervasiveness required to alter the terms of employment under Title VII.

### 2. Plaintiff fails to state a claim for Title VII retaliation.

Plaintiff also fails to plausibly allege retaliation under Title VII. To establish such a claim, Plaintiff must show: (1) he engaged in protected conduct related to Title VII discrimination; (2) he suffered an adverse employment action thereafter; and (3) there is a causal connection between his protected conduct and the adverse action. *Laul v. Los Alamos Nat'l Labs.*, 765 Fed. Appx. 434, 441-42 (10th Cir. 2019).

Here, Plaintiff vaguely alleges that he raised "concerns about discriminatory treatment" to HR, but offers no information as to when, to whom, or in what form. Consequently, this lack of detail prevents the Court from reasonably inferring any temporal connection between this purported protected activity and the adverse employment actions that allegedly followed. Plaintiff alleges his termination occurred after the alleged HR complaint and was the result of a PIP process that had been ongoing—but does not allege any direct statements or conduct linking the HR complaint to the termination. Nor can one, based on these allegations, reasonably infer any temporal connection between the time of report (Plaintiff fails to provide this detail) and the allegedly adverse employment actions that followed.

Plaintiff's assertion that the PIP was "unjustified" or "retaliatory" is also conclusory and unsupported by facts—such as how the PIP was fabricated, who made the decision, or what made its terms or findings unreasonable or inaccurate. And crucially, there is only one (at best) allegation related to his race, ethnicity, and national origin. This highlights the little factual support to infer

that the alleged Title VII (discrimination) and retaliation was based on Plaintiff's HR complaint.

Without more, Plaintiff's Title VII retaliation claim must be dismissed.

### 3.    CONCLUSION

WHEREFORE, for the foregoing reasons, Defendant Arapahoe Community College respectfully requests that the Court dismiss with prejudice Plaintiff's Second, Fourth, and Fifth Claims for Relief pursuant to Rule 12(b)(1), and Plaintiff's First and Third Claims for Relief under Rule 12(b)(6).

Respectfully submitted this 21st day of April, 2025.

DIETZE AND DAVIS, P.C.

*/s/ Christina M. Gonsalves*
Christina M. Gonsalves
William A. Rogers, III
2060 Broadway, Suite 400
Boulder, CO  80302
303-447-1375
cgonsalves@dietzedavis.com
wrogers@dietzedavis.com
Attorneys for Defendant

14

<u>**CERTIFICATE OF SERVICE**</u>

This is to certify that on the 21st day of April, 2025, I duly served the within

**DEFENDANT'S MOTION TO DISMISS PLAINTIFF'S COMPLAINT AND JURY**

**DEMAND (DOC. 1)** upon all parties herein by filing via CM/ECF addressed as follows:

Deborah E. Yim
PRIMERA LAW GROUP, LLC
1241 S. Parker Road, Suite 201
Denver, CO 80231
(720) 239-2567
dyim@primeralaw.com
Attorney for Plaintiff

        */s/ Cecil Kennedy*
        Paralegal